IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. |
| | ) | |
| v. | ) | |
| | ) | |
| JEAN-PHILIPPE BOURSIQUOT, | ) | |
| B&C ROYALTY MULTI-SERVICES, INC., | ) | |
| ROBERTON BOURSIQUOT, and | ) | |
| RBS FLAMBOYANT SOLUTIONS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**COMPLAINT FOR PERMANENT INJUNCTION**

The United States of America, by and through undersigned counsel, complains and alleges as follows:

1.      The United States of America brings this action to restrain and enjoin Defendants Jean-Philippe Boursiquot, B&C Royalty Multi-Services, Inc., Roberton Boursiquot, and RBS Flamboyant Solutions, Inc., and all those acting in concert with or under their direction and/or control, from:

   a. Preparing, filing, directing, or assisting in the preparation or filing of federal tax returns, amended returns, and other related documents and forms, including any electronically-submitted tax returns or tax-related documents, for any entity or person other than themselves;

   b. Preparing or assisting in the preparation of federal tax returns that they know will result in the understatement of any tax liability or the overstatement of federal tax refunds;

c.   Engaging in any activity subject to penalty under 26 U.S.C. §§ 6694, 6695, and 6701; and

d.   Engaging in any fraudulent or deceptive conduct which substantially interferes with the proper administration and enforcement of the internal revenue laws.

2.      This action also seeks an order, under 26 U.S.C. § 7402(a), requiring Defendants to disgorge to the United States the gross receipts they have received for the preparation of federal tax returns making false or fraudulent claims.

## JURISDICTION AND VENUE

3.      Pursuant to 26 U.S.C. § 7401, the Chief Counsel of the Internal Revenue Service, a delegate of the Secretary of the Treasury, authorized and requested this action and the Attorney General of the United States directed that it be commenced.

4.      The Court has jurisdiction to hear this action pursuant to 28 U.S.C. §§ 1340 (internal revenue laws) and 1345 (United States as plaintiff), and 26 U.S.C. § 7402(a) (render judgments).

5.      Pursuant to 26 U.S.C. §§ 7407(a) and 7408(a), and 28 U.S.C. § 1391(b), venue is proper because Defendants reside in the district, maintain their principal places of business in the district, and a substantial part of the events or omissions giving rise to the United States' claims occurred in the district.

## DEFENDANTS

6.      Defendants Jean-Philippe Boursiquot ("Jean-Philippe") and Roberton Boursiquot ("Roberton") are brothers.

7.      Jean-Philippe resides in Margate, Florida. He owns and operates Defendant B&C Royalty Multi-Services, Inc. ("B&C Royalty"), a tax return preparation business in Oakland Park, Florida.

8.      Roberton resides in Tamarac, Florida. He owns and operates Defendant RBS Flamboyant Solutions, Inc. ("RBS Flamboyant"), a tax return preparation business in Hollywood, Florida.

### SUMMARY OF JEAN-PHILIPPE AND B&C ROYALTY'S ACTIVITIES

9.      Jean-Philippe started to prepare tax returns in 2011 for a firm called 1st Choice. That same year, he formed his own tax preparation business, B&C Royalty. He began preparing returns through B&C Royalty in 2012.

10.     As many as five preparers work at B&C Royalty during tax filing seasons. These preparers are primarily his family members. Jean-Philippe does not require them to have any formal training, nor does he review their work.

11.     Virtually every return prepared by Jean-Philippe and/or B&C Royalty has requested a refund. From 2011 through 2016, Jean-Philippe and/or B&C Royalty filed 3,222 returns. Only five did not report a refund due and a significant majority also claimed the Earned Income Credit (EIC).

| Filing Year | # of Returns | Refund Returns | EIC Returns |
|:---:|:---:|:---:|:---:|
| 2011 | 24* | 24 (100%) | 17 (70%) |
| 2012 | 959^ | 957 (99%) | 688 (71%) |
| 2013 | 797^ | 795 (99%) | 610 (76%) |
| 2014 | 965^ | 964 (99%) | 706 (73%) |
| 2015 | 42^ | 42 (100%) | 33 (78%) |
| 2016 | 435^ | 435 (100%) | 294 (67%) |

*Returns filed under Jean-Philippe's Preparer Tax Identification Number (PTIN).
^Returns filed under B&C Royalty's Employer Identification Number (EIN).

12.     The chart above likely substantially understates the number of returns prepared by Jean-Philippe and/or B&C Royalty. Jean-Philippe sometimes inputs other preparers' names and numeric identifiers into returns without their knowledge or consent. As a result, it is nearly impossible to precisely determine how many returns he has prepared or affected.

13.     Returns prepared by Jean-Philippe and/or B&C Royalty claim large credits and, therefore, unusually high refunds.

14.     The Service has received complaints questioning the validity of returns prepared by Jean-Philippe and/or B&C Royalty. In 2013, a concerned citizen submitted a complaint on behalf of a homeless man. The complaint asserted that the man visited B&C Royalty after hearing that its preparers could get homeless and disabled people "stimulus money." A preparer filled out a tax return for the man although he had no income. The preparer told him he would receive a refund of over $900. The man did not receive a copy of his return. The same year, a customer filed an administrative complaint against B&C Royalty after the Service froze his $2,117 refund because he could not provide support for credits claimed or withholdings reported. B&C Royalty did not provide the client with a copy of his return.

15.     In 2014, and again in 2015, a local news channel aired investigative reports on customers' allegations that B&C Royalty was preparing false returns.

16.     The Service examined 34 returns prepared by B&C Royalty for the 2012 and 2013 tax years. All but one required a downward adjustment. On average, the returns overstated refunds due by $4,064.  Thus, the 33 examined returns with changes alone showed a tax loss of $134,112.

/  /  /

/  /  /

**Jean-Philippe and B&C Royalty's Schemes**

17.     The Service found that Jean-Philippe and/or B&C Royalty have repeatedly and continually prepared tax returns that understate liabilities and overstate refunds, including by claiming false education credits and bogus earned income tax credits, fabricating Schedule Cs, and falsifying federal tax withholdings. In addition, Jean-Philippe and/or B&C Royalty have repeatedly failed to provide customers with copies of their returns and claimed refunds in excess of the amounts quoted to customers.

*False Education Credits*

18.     Jean-Philippe and/or B&C Royalty repeatedly and continually claimed education credits for taxpayers who did not incur qualifying expenses.

19.     Education credits are available to qualified students. Eligible educational institutions file a Form 1098-T for each student they enroll to report payments received, or amounts billed, for qualified tuition and related expenses. The Service can discover a fraudulent education credit if no Form 1098-T is filed for the taxpayer, or by interviewing the taxpayer and asking whether he or she attended college.

20.     The Service identified 264 returns prepared by B&C Royalty in the most recently completed filing season covering the 2015 tax year that claimed education credits for individuals who lacked a Form 1098-T. These unsupported education credits total $401,364 for one year alone.

*Bogus Earned Income Tax Credits and Fabricated Schedule Cs*

21.     As shown in paragraph 11 above, the majority of returns prepared by Jean-Philippe and/or B&C Royalty claim the EIC.

22.     The EIC is a refundable tax credit available to certain low-income taxpayers. 26 U.S.C. § 32. It is treated as a tax payment and thus may result in a tax refund to the extent it exceeds a payer's tax liability.

23.     The amount of the EIC varies based on a taxpayer's income, filing status, and number of claimed dependents. For certain income ranges, individuals with higher annual incomes are entitled to a larger credit than those with lower annual incomes. The amount of the credit increases as reported income climbs from $1 to the annual ceiling set by the Service, and decreases beyond that ceiling. The range of income corresponding to the maximum EIC is sometimes referred to as the "sweet spot."

24.     Jean-Philippe and/or B&C Royalty manipulated return information in order to bring the taxpayers' reported earned income within the "sweet spot" for the EIC or, in some cases, to secure an EIC for a customer who would not otherwise qualify.

25.     For example, Jean-Philippe and/or B&C Royalty fabricated business income or expenses claimed on Schedule C (Form 1040), Profit or Loss from Business, in order to increase income to qualify for the EIC or decrease income if needed to offset wages.

26.     Jean-Philippe and/or B&C Royalty invented fake dependents.

### *Falsified Federal Tax Withholdings*

27.     Jean-Philippe and/or B&C Royalty routinely recorded false income and federal withholdings on clients' returns.

28.     For unemployed and independently employed customers, Jean-Philippe and/or B&C Royalty repeatedly reported federal withholdings although the customers had none.

29.     For wage-earning customers, Jean-Philippe and/or B&C Royalty regularly prepared returns that inflated federal withholdings and did not agree with the customer's supporting documentation, such as W-2s.

### *Misrepresenting Fees, Refunds, and Return Contents to Customers*

30.     Jean-Philippe and/or B&C Royalty did not provide all clients with copies of their returns. In some circumstances, they provided customers with versions of returns that did not match the returns actually filed with the Service.

31.     Jean-Philippe and/or B&C Royalty quoted refunds to clients that were substantially smaller than the refund returns submitted to the Service on their behalf.  Jean-Philippe and/or B&C Royalty pocketed the excess as preparation fees, often without clients' knowledge.

32.     Jean-Philippe and/or B&C Royalty charged exorbitant preparation fees, sometimes without customers' knowledge of how much they were charged or how much their refund return claimed.

### **Specific Examples of Fraudulent Conduct**

33.     Revenue Agents interviewed B&C Royalty customers. Information obtained through the interviews is detailed below. To protect the customers' identities, the Complaint refers to each customer by number, e.g., Customer 1 (abbreviated to C1), etc.

34.     Customer 1 hired B&C Royalty to prepare his 2012 return. He was assisted by a man named "Philip." C1 did not tell Philip he had a brother. In fact, he does not have a brother. However, his return claimed a disabled brother as a qualifying dependent for the EIC. C1 did not tell Philip that he went to college, but his return claimed a $2,000 refundable education credit. C1 did not receive a copy of his return. Philip asked him if he would be happy with a refund of

$5,928, which is amount listed on the return filed with the Service on his behalf. Eventually, C1 received around $2,300 from a bank check — thousands of dollars less than his actual refund. C1 does not know how much B&C Royalty charged to prepare his return. The preparation fee came out of his refund.

35.     Customer 2 hired B&C Royalty to prepare his 2012 return. He met exclusively with "Phil." C2 provided a Form 1099 for income and nothing else. C2 told the preparer he did not receive any wages. C2 did not have any federal tax withholdings. Nevertheless, his return listed wages and federal withholdings. He did not go to college, but the return claimed a $2,000 refundable education credit. Phil told C2 that he could claim his girlfriend as a dependent. C2 did not realize that his girlfriend was listed as his half-sister on the return.

36.     Customer 3 hired B&C Royalty to prepare his 2012 and 2013 tax returns. He dealt exclusively with "Philip," although unknown individuals signed as the preparers of his returns. C3 provided no documentation, like a Form 1098-T, to indicate school expenses. Nor did C3 tell the preparer that he incurred any specific amount of school expenses. Nevertheless, the 2012 return prepared by B&C Royalty reported qualified education expenses and claimed an education credit. The 2012 return also overstated C3's federal tax withholdings by $831. "Philip" gave C3 a copy of his 2013 return which showed a refund of $892. The return filed with the Service showed a refund of $1,310.

37.     A preparer at B&C Royalty told Customer 4 that he was due a federal tax refund for the 2013 tax year, even though he had no income, because of a special government grant. The preparer input C4's personal information into a computer and passed him a piece of paper with $780 written on it. The preparer asked him if it was OK. C4 agreed. The preparer did not show him, or provide him a copy of, his return. C4 understood that B&C Royalty would receive his

refund from the Service and pass it along to him. Thereafter, the Service contacted C4 directly to confirm his identity. C4 acquired a copy of the filed 2013 return. It claimed a refund of $1,505; hundreds of dollars more than he was promised. Moreover, the return included false information. Although C4 told the preparer he had not been in school since the 1980s, the return claimed an education credit. It stated C4 was self-employed and a wage-earner, although he was neither

38.     Jean-Philippe prepared Customer 5's 2015 return. C5 told Jean-Philippe that he did not attend college. However, his return claimed $2,058 in education credits. C5 paid $100 at the time his return was prepared. He estimates his refund check was for $1,700. However, his return reflects a refund of $2,735.

39.     Customer 6 hired B&C to prepare his 2015 return. He gave the preparer, Phillip, a W-2 and no other documentation. C6 told Phillip that he had never attended college. However, his return claimed $973 in education credits. C6 received a refund check for $1,600. However, the total refund on his return was $2,323 – a difference of $723.

40.     Customer 7's 2015 return is signed by Jean-Philippe. However, a man named Moses Davidson prepared his return. C7 did not attend school and did not inform Moses otherwise. However, his return claimed $1,579 in education credits.

## Continued Misconduct in Current Tax Season

41.     Returns filed by Jean-Philippe and/or B&C Royalty in the current filing year exhibit patterns indicating continued fraud and abuse. As of February 21, 2017, 190 returns for the 2016 tax year have been filed under B&C Royalty's EIN. Of those 190 returns, 189 (99 percent) claimed a refund and 144 (75 percent) claimed the EIC.

## SUMMARY OF ROBERTON AND RBS FLAMBOYANT'S ACTIVITIES

42.     Jean-Philippe taught Roberton how to prepare tax returns.

43.     Roberton began preparing returns in 2011. He formed RBS Flamboyant in 2012 and began preparing returns through RBS Flamboyant in the 2013 filing season.

44.     Roberton employs other preparers, primarily old friends and acquaintances, to work at RBS Flamboyant.

45.     Roberton participates in Jean-Philippe's service bureau, i.e. he uses Crosslinks tax return software sold by Jean-Philippe. Jean-Philippe receives $30 for every electronic submission made by RBS Flamboyant and, therefore, has a financial interest in the volume of returns it electronically files.

46.     Virtually every return prepared by Roberton and/or RBS Flamboyant has claimed a refund, and the majority claimed the EIC.

| Filing Year | # of Returns | Refund Returns | EIC Returns |
|---|---|---|---|
| 2013 | 345* | 345 (100%) | 211 (61%) |
| 2014 | 424* | 423 (99%) | 319 (75%) |
| 2015 | 134* | 133 (99%) | 100 (74%) |
| 2016 | 180* | 178 (98%) | 128 (71%) |

*Returns filed under RBS Flamboyant's EIN.

47.     The figures listed above are likely substantially understated. Roberton does not consistently input his personal Preparer Tax Identification Number (PTIN), a number that a paid tax return preparer must use on federal tax returns, or RBS Flamboyant's EIN, a number assigned to an employer, in the paid preparer section of submitted tax returns. Without these indicators, it is it is very difficult to precisely define the number of returns he has prepared. For example, the Service identified 503 returns filed for the 2012 and 2013 tax years under Roberton's Electronic Filing Identification Number (EFIN), a number assigned by the Service to preparers accepted into the e-filing program, but not linked to his PTIN or EIN. Those 503 returns are not counted above.

48. The Service examined 52 returns prepared by Roberton for tax years 2011 through 2013. 48 percent (25 returns) required adjustment. The two main areas of adjustment were the EIC and education credits. The average deficiency was $2,062 per return.  Thus, just the 25 adjusted returns demonstrates a tax loss of $51,550.

### Roberton and RBS Flamboyant's Schemes

49. The Service found that Roberton and/or RBS Flamboyant repeatedly and continually prepared tax returns that understate liabilities and overstate refunds by claiming false education credits, bogus earned income tax credits, fabricated Schedule Cs, and incorrect federal tax withholdings, and by misrepresenting fees, refunds, and return contents to customers.

### *False Education Credits*

50. Roberton and/or RBS Flamboyant repeatedly claimed education credits for taxpayers who did not incur qualifying expenses.

51. For the most recent completed filing year, the Service identified 48 2015 returns prepared by RBS Flamboyant that claimed education credits for individuals who lacked a Form 1098-T. These unsupported education credits total $71,116 for one year alone.

### *Bogus Earned Income Tax Credits and Fabricated Schedule Cs*

52. As shown in paragraph 46 above, the majority of returns prepared by Roberton and/or RBS Flamboyant claim the EIC.

53. Roberton and/or RBS Flamboyant manipulated return information in order to bring taxpayers' reported earned income within the "sweet spot" for the EIC or, in some cases, to secure an EIC for a customer who would not otherwise qualify.

54.     For example, Roberton and/or RBS Flamboyant fabricated business income or expenses claimed on Schedule C (Form 1040), Profit or Loss from Business, in order to increase income to qualify for the EIC or decrease income if needed to offset wages.

### Falsified Federal Tax Withholdings

55.     Roberton and/or RBS Flamboyant routinely recorded false income and federal withholdings on clients' returns.

56.     For unemployed and independently employed customers, Roberton and/or RBS Flamboyant repeatedly reported federal tax withholdings although there were none.

57.     For wage-earning customers, Roberton and RBS Flamboyant regularly prepared returns that inflated federal withholdings and did not agree with the customers' supporting documentation, such as W-2s.

### Misrepresenting Fees, Refunds, and Return Contents to Customers

58.     Roberton and/or RBS Flamboyant did not provide all clients with copies of their returns. In some circumstances, they provided customers with versions of returns that did not match the returns actually filed with the Service.

59.     Roberton and/or RBS Flamboyant quoted refunds to clients that were substantially smaller than the refund returns submitted to the Service on their behalf.  Roberton and/or RBS Flamboyant pocketed the excess as preparation fees, often without clients' knowledge.

60.     Roberton and/or RBS Flamboyant charged exorbitant preparation fees, sometimes without customers' knowledge of how much they were charged or how much their refund return claimed.

61.     Roberton and/or other preparers at RBS Flamboyant forged taxpayers' signatures on fee agreements and tax returns.

## Specific Examples of Fraudulent Schemes

62.     The following information was acquired through interviews and tax return examinations. To protect customers' identities, the Complaint refers to each customer by letter, e.g., Customer A (abbreviated to CA), etc.

63.     Customer A hired RBS Flamboyant to prepare her 2013 tax returns. CA was not a student, but the return claimed a $1,000 refundable education credit. The return does not match supporting documents on file. It overstated federal tax withholdings. During their interview, the Revenue Agent showed CA a copy of her return filed with the Service. CA did not recognize her signature on the return or the associated Form 8879, IRS e-file Signature Authorization. CA did not sign any forms for preparer fees. Indeed, she did not know what the fees were. However, RBS Flamboyant's file for CA included a signed form agreeing to $702 in fees.

64.     Roberton prepared Customer B's 2013 tax return.  CB provided Roberton with one Form 1099. Roberton did not ask CB any questions or provide him with a copy of his return. The return improperly reported the income on the Form 1099 as "other income." The return reported $3,084 in wages and $488 in federal income tax withholdings. CB did not have a W-2 and does not know where those figures came from. The return also claimed $478 in bogus fuel tax credits. CB did not know how much Roberton charged for his services. RBS Flamboyant's file for CB included a signed form agreeing to $612 in fees. The signatures in the file are not CB's. The return claimed a refund of $1,201. CB received $500.

65.     Roberton prepared Customer C's 2013 return. The return overstated federal tax withholdings by $560 and also claimed a bogus fuel tax credit of $409. CC's copy of the return

showed a refund of $3,500, but the filed version claimed a refund of $5,065 — a difference of $1,565.

66.     Customer D hired RBS Flamboyant to prepare her 2015 tax return. Robert's brother, "Fred," prepared her return. He charged her $600 to input her two W-2s into the computer. Fred gave CD a copy of her return but did not go over it with her. The return claimed $1,643 in education credits. CD did not tell the preparer that she attended college. The return included a Schedule C that reported a net loss for CD's business. CD does not have business.

67.     Roberton prepared Customer E's 2015 return. Income documents reported to the Service by third parties show discrepancies in the income and federal withholdings reported on the return. While third party documents show CE made $310 in wages and had no federal withholdings, her return reported $3,210 in wages and $462 in withholdings. Documents indicate CE had $26,478 in Schedule C income, but her return reported just $7,880.  Her return claimed a $3,290 EIC. There is no Form 1098-T to support the $2,500 in education expenses reported on her return.

68.     Customer F hired RBS Flamboyant to prepare her 2015 return. Robert's brother, "Fred," prepared her return. CF was not aware that her return claimed a $1,000 refundable education credit. She did not tell Fred that she attended college. Fred gave CF a copy of her return. It does not match the return filed with the Service. Her version shows a refund of $7,332. The return filed by RBS Flamboyant claimed a refund of $7,897 – $565 more. CF received a check from RBS Flamboyant for $7,152 — $745 less than her actual refund.

### Continued Misconduct in Current Tax Season

69.     Returns filed by Roberton and/or RBS Flamboyant in the current filing year exhibit patterns indicating continued fraud and abuse. As of February 21, 2017, 40 2016 tax

14

returns have been filed under RBS Flamboyant's EIN. Of those 40 returns, all claimed a refund and 85 percent (34) claimed the EIC.

## HARM CAUSED BY DEFENDANTS' ACTIONS

70.     Defendants' fraudulent practices over the years have harmed their customers, the United States, and the public.

71.     Customers paid Defendants to prepare their tax returns properly. Instead, Defendants falsified the returns to create inflated refunds and pocketed a sizeable portion of the claimed refunds.  Many customers are now liable for the entire amount of the refunds wrongly claimed in their names, plus penalties and interest.

72.     The United States has been harmed by the loss of significant tax revenue. As shown in paragraphs 20 and 51 above, just one of Defendants' schemes — false education credits — resulted in lost tax revenue of over $472,000 for the most recently completed filing season alone. Investigating agents estimate that total lost tax revenue as a result of Defendants' conduct is in the millions of dollars. However, estimation is difficult without knowing the total number of returns prepared by Defendants. Defendants do not consistently identify themselves as the preparers of returns, and sometimes falsely input other preparers' information.

73.     The United States is further harmed because the Service must devote its finite resources to identifying Defendants' customers, ascertaining their correct tax liabilities, recovering any refunds erroneously issued, and collecting additional taxes and penalties owed.

74.     Defendants' activities also undermine public confidence in the administration of the federal tax system and encourage noncompliance with internal revenue laws.

/  /  /

/  /  /

## COUNT I – INJUNCTION UNDER 26 U.S.C. § 7407

75.     The United States incorporates by reference the allegations in paragraphs 1 through 74 above.

76.     Section 7407 of the Internal Revenue Code authorizes a district court to enjoin any tax return preparer from further engaging in conduct subject to penalty under section 6694 or 6695 of the Code, or any other fraudulent or deceptive conduct which substantially interferes with the proper administration of the internal revenue laws, if injunctive relief is appropriate to prevent the recurrence of such conduct.

77.     Moreover, Section 7407 authorizes a district court to permanently enjoin a person from acting as a tax return preparer if it finds (1) the preparer has continually or repeatedly engaged in conduct subject to penalty under Section 6694 or 6695, or any other fraudulent or deceptive conduct which substantially interferes with the proper administration of the Internal Revenue Code,  and (2) an injunction prohibiting that specific conduct would not sufficiently prevent the preparer's interference with the proper administration of the Internal Revenue Code.

78.     Defendants have continually and repeatedly engaged in conduct subject to penalty under 26 U.S.C. § 6694(a) by preparing returns that understate the filers' tax liabilities and overstate their refunds based on unreasonable and reckless positions. As described above, Defendants prepared tax returns with falsified information, fabricated income and deductions, and bogus credits. Defendants did so with the knowledge that the positions taken on the returns were unreasonable and lacked substantial authority.

79.     Additionally, Defendants have continually and repeatedly engaged in conduct subject to penalty under 26 U.S.C. § 6694(b) by willfully understating tax liabilities on federal returns, and acting with a reckless and/or intentional disregard of rules and regulations.

16

80.     Defendants have continually and repeatedly engaged in conduct subject to penalty under 26 U.S.C. § 6695(b)&(g) by failing to properly identify themselves on returns prepared and failing to comply with due diligence requirements with respect to determining eligibility for, and the amount of, earned income and education credits.

81.     Defendants have continually and repeatedly engaged in fraudulent and deceptive conduct which substantially interferes with the proper administration of the internal revenue laws. They have engaged in pervasive tax fraud by making, and/or directing/encouraging others to make, false claims on their customers' tax returns including: fabricating business income and expenses, reporting bogus education credits, and engaging in other fraudulent activities aimed at maximizing their customers' refunds and, in turn, their fees.

82.     Despite media attention and notice of Internal Revenue Service investigations, Defendants continue to engage in the conduct described above. To prevent the recurrence of such conduct, injunctive relief is appropriate under Section 7407.

83.     A narrow injunction against only specified conduct would not suffice. The variety of schemes employed by Defendants and the brazenness with which they operate — even in the face of media attention and Service investigation — show that an injunction against only specific conduct would not be sufficient to prevent future interference with the internal revenue laws.

### COUNT II – INJUNCTION UNDER 26 U.S.C. § 7408

84.     The United States incorporates by reference the allegations in paragraphs 1 through 83 above.

85.     Section 7408 of the Internal Revenue Code authorizes a district court to enjoin any person from further engaging in specified conduct subject to penalty under section 6701, if injunctive relief is appropriate to prevent the recurrence of such conduct.

86.     Defendants have engaged in conduct subject to penalty under 26 U.S.C. § 6701 by preparing or directing the preparation of income tax returns that they knew or had reason to know understated liabilities and inflated refunds.

87.     Despite media attention and notice of government investigations, Defendants continue to engage in the conduct described above. To prevent the recurrence of such conduct, injunctive relief is appropriate under Section 7408.

## COUNT III – INJUNCTION UNDER 26 U.S.C. § 7402(a)

88.     The United States incorporates by reference the allegations in paragraphs 1 through 87 above.

89.     Section 7402(a) of the Internal Revenue Code authorizes a district court to issue orders of injunction as may be necessary or appropriate for the enforcement of internal revenue laws.

90.     Defendants, through the actions described above, have engaged in conduct that substantially interferes with the enforcement of the internal revenue laws.

91.     Unless enjoined, Defendants are likely to continue to engage in such conduct and interfere with the proper administration and enforcement of the Internal Revenue Code. Defendants have not been dissuaded by negative media attention or government investigations. Court intervention is needed to halt their activities.

92.     The United States will suffer irreparable harm if Defendants are not enjoined. It will continue to provide federal income tax refunds to individuals who are not entitled to receive them. The United States will also be forced to expend substantial unrecoverable time and resources to detect and audit Defendants' customers' defective returns. Despite these efforts, many improper refund returns prepared by Defendants will never be discovered or recovered.

93.     Remedies available at law, such as monetary damages, are inadequate to compensate the United States for its irreparable injuries sustained as a result of Defendants' conduct.

94.     Considering the balance of hardships between the United States and Defendants, a remedy in equity is warranted. While the United States will suffer irreparable injury if Defendants are not enjoined, Defendants will not be harmed by an injunction compelling them to obey the law. They will able to pursue other financial means to support themselves.

95.     It would serve the public interest to enjoin Defendants. An injunction — backed by the Court's contempt power, if needed — will stop illegal conduct and the harm it causes the United States and taxpayers, as well as the continued undermining of public confidence in the administration of the federal tax system.

96.     Defendants, therefore, should be enjoined under 26 U.S.C. § 7402(a).

**COUNT IV – DISGORGEMENT UNDER 26 U.S.C. § 7402(a)**

97.     The United States incorporates by reference the allegations of paragraphs 1 through 96 above.

98.     Section 7402(a) of the Internal Revenue Code authorizes a district court to issue orders, judgment, and decrees as may be necessary or appropriate for the enforcement of the internal revenue laws.

99.     Defendants' conduct substantially interferes with the enforcement of the internal revenue laws. They caused the United States to issue tax refunds to individuals not entitled to receive them. But-for Defendants' conduct, the United States would not have issued these bogus refunds.

100.     Defendants have unjustly profited from their misconduct as the expense of the United States. They subtracted exorbitant fees from their clients' bogus refund returns.

101.     Defendants are not entitled to these ill-gotten gains. Using its broad authority under Section 7402(a), the Court should enter an order requiring Defendants to disgorge to the United States the receipts (in the form of fees subtracted from customers' tax refunds) they have received for the preparation of federal tax returns that make grossly incompetent, negligent, reckless, and/or fraudulent claims.

**WHEREFORE**, the United States prays that this Court:

A.     Find, pursuant to 26 U.S.C. § 7407, that:

1.   Defendants have continually and repeatedly engaged in conduct subject to penalty under 26 U.S.C. §§ 6694 and 6695, and other fraudulent or deceptive conduct which substantially interferes with the proper administration of the internal revenue laws;

2.   Injunctive relief is appropriate to prevent the recurrence of such conduct; and

3.   A narrower injunction enjoining Defendants from only specified conduct would not be sufficient to prevent their interference with the proper administration of the Internal Revenue Code;

B.     Find Defendants have engaged in conduct subject to penalty under 26 U.S.C. § 6701, and injunctive relief is appropriate to prevent the recurrence of such conduct pursuant to 26 U.S.C. § 7408;

C.     Find Defendants have engaged in conduct that substantially interferes with the enforcement of internal revenue laws, and injunctive relief is appropriate to prevent the

recurrence of such conduct pursuant to the Court's inherent equitable powers and 26 U.S.C. 7402(a);

D.     Enter a permanent injunction prohibiting Defendant, and all those in active concert or participation with them, from:

1.   Preparing, filing, directing, or assisting the preparation or filing of federal tax returns, amended returns, or other related documents or forms, including any electronically submitted tax returns or tax-related documents, for any person or entity other than themselves;

2.   Preparing or assisting in the preparation of federal tax returns, amended returns, or other related documents or forms that they know will understate federal tax liabilities;

3.   Engaging in any other activity subject to penalty under 26 U.S.C. §§ 6694, 6695, and 6701; and

4.   Engaging in any conduct that substantially interferes with the proper administration and enforcement of the Internal Revenue Code.

E.     Enter an injunction requiring, within 30 days of entry of the injunction, that Defendants:

1.   Contact, by regular mail or email, all persons for whom they have prepared a federal tax return since January 1, 2013 to inform them of the permanent injunction entered against Defendant and provide them with a copy thereof (but including no other documents or enclosures unless agreed to by counsel for the United States or approved by the Court), and file with the Court a sworn certificate stating that they have complied with this requirement; and

2. Produce to counsel for the United States a list of all persons for whom they prepared federal income tax returns or claims for refund since January 1, 2013, including names, social security numbers, addresses, email addresses, telephone numbers, and all relevant tax periods.

F.     Order, without further proceedings, the immediate revocation of any and all Preparer Tax Identification Numbers (PTIN) held by, assigned to, or used by Defendants pursuant to 26 U.S.C. § 6109;

G.     Order the immediate revocation of any Electronic Filing Identification Number (EFIN) held by, assigned to, or used by Defendants;

H.     Enter an order, pursuant to 26 U.S.C. § 7402(a), requiring Defendants to disgorge to the United States the gross receipts (the amount of which is to be determined by the Court) that Defendants received (in the form of fees subtracted from customers' tax refunds) for the preparation of tax returns that make or report false or fraudulent claims, deductions, credits, income, expenses, or other information that results in the understatement of taxes;

I.     Permit the United States to conduct discovery to monitor Defendants' compliance with the terms of any permanent injunction entered against them;

J.     Retain jurisdiction over Defendants and this action to enforce any permanent injunction entered; and

/  /  /

/  /  /

/  /  /

/  /  /

K.      Award the United States its costs incurred in connection with this action, along

with such other relief as justice requires.

Dated: March 16, 2017                          Respectfully submitted,

                                               DAVID A. HUBBERT
                                               Acting Assistant Attorney General


                                               */s/ Kari A.R. Powell*
                                               KARI A.R. POWELL
                                               Trial Attorney, Tax Division
                                               U.S. Department of Justice
                                               P.O. Box 14198
                                               Ben Franklin Station
                                               Washington, D.C. 20044
                                               Tel: (202) 514-6068
                                               Fax: (202) 514-9868
                                               Kari.Powell@usdoj.gov